IN  THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

KENNETH L. HENDERSON #409-972    :
:
v.    :    CIVIL ACTION NO. CCB-13-1421
:
SGT. MARVIN SIMPKINS    :

## MEMORANDUM

Pending is Simpkins' motion to dismiss or, in the alternative, motion for summary judgment.  (ECF No. 30.)  Henderson was advised of his right to file an opposition response to Simpkins' motion and of the consequences of failing to do so, (ECF No. 31), but has failed to oppose the motion.[1]  The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, Simpkins' motion, construed as a motion for summary judgment, will be granted.

## Background

Henderson, currently incarcerated at the Maryland Correctional Training Center ("MCTC"), seeks $7 million in damages pursuant to 42 U.S.C. § 1983.  Henderson states that on the morning of April 26, 2013, while housed at the Metropolitan Transition Center ("MTC"), he was assaulted and choked by Simpkins while his hands were cuffed behind his back.  After the incident he was taken to the medical department where he was seen by a nurse.  Henderson indicates a medical report was written and photographs were taken of his injuries.  He complains

---

[1] Henderson instead seeks to supplement his complaint to add the Secretary of the Department of Public Safety and Correctional Services ("DPSCS") and the Warden at Maryland Reception Diagnostic Classification Center ("MRDCC") as defendants, claiming they failed to relocate prisoners from the facility by April 15, 2013, as required by court order.  (Mot. to Amend Compl., ECF No. 18, at 2-3; Supp. to Compl., ECF No. 38.)  The exhibits attached to ECF No. 38 do not demonstrate administrative exhaustion regarding plaintiff's alleged exposure to asbestos while housed at MRDCC; thus, the claim against the Secretary and Warden would be subject to dismissal for failure to exhaust. Accordingly, supplementation is denied pursuant to Fed. R. Civ. Pro. 15(a)(2).

that he received a notice of infraction for the incident and that his request that copies of the photographs and the medical report be considered at his adjustment hearing was denied.

Henderson also claims he was exposed to asbestos, which fell from the ceiling, walls, and pipes, during the month he was housed at MTC and that he and others were housed there even though the facility had been condemned.   He contends that he attempted to exhaust administrative remedies concerning his conditions of confinement claim but was forced  to withdraw an Administrative Remedy Procedure ("ARP") complaint concerning exposure to asbestos.  (Compl., ECF No. 1[2]; Supp. To Compl. Ex. 4, ECF No. 4-4, at 1.)

Simpkins has submitted a declaration detailing a different version of the April 26, 2013, incident.  He states that at approximately 8:00 a.m., Sgt. Angela Ellis sent a radio transmission to meet her at D-Dorm, Bed D-27B.  When he arrived, Simpkins saw Henderson refusing to be handcuffed while cursing at Sgt. Ellis, yelling, "Fuck you! You ain't cuffing me! None of y'all better not touch me!"  (Simpkins Decl., ECF No. 30-2, ¶ 3.)  Several times, Ellis ordered Henderson to turn around to be handcuffed, but he refused to comply.  (*Id.*)  When Simpkins also ordered Henderson to turn around to be handcuffed, Henderson stated "Hey Sarge! Don't touch me! If any of y'all touch me these inmates in the dorm will help me! You think I'm playing?" (*Id.* ¶ 4.)  Simpkins again ordered Henderson to turn around and he complied with that order but continued to be disrespectful to Simpkins and Ellis.  (*Id.* ¶¶ 4, 5.)  He also attempted to jerk himself away and called the officers "bitches and whores" as they escorted him to the lower level to be seen by a supervisor. (*Id.* ¶ 5.)

When Simpkins attempted to place Henderson in the segregation booth, Henderson resisted and yelled "I'ma kill you bitch! I'm Big Kenny from Poplar Grove bitch! You're a dead

---

[2] Henderson states under penalty of perjury that the facts set forth in his complaint are true.  (Compl. at 3.)

man! I'm telling you, I'ma kill you! You think it's a game?" (*Id*. ¶ 6.)  Lt. Carroll Washington placed plaintiff in the segregation booth without further incident. *Id*.

Simpkins wrote an infraction against Henderson charging him with violations of several rules barring involvement in a disruptive activity, use of threatening language, interference with or resisting the duties of staff, disobeying a direct lawful order, and exhibitions, demonstrations, or conveyances of insolence, disrespect, or vulgar language.  (*Id*. ¶ 7.) Ellis also issued an infraction against Henderson for the same rule violations.  (*Id*.; *see also* Def.'s Mot. Ex. 2, ECF No. 30-3, at 10, 13.)  At the adjustment hearing held on May 10, 2013, Henderson was found guilty of violating the rules except for that barring disruptive activity, as the hearing officer determined there was no evidence to support a guilty finding.  (Def.'s Mot. Ex. 2 at 3-5.)  He received 65 days of disciplinary segregation for violating the rule barring the use of threatening language and fifteen days concurrent for the remaining violations.  (*Id*. at 6.)  The decision and sanctions were approved by the warden on June 12, 2013.  (*Id*. at 1.)

An investigation into the incident by the Internal Investigative Unit (IIU) was convened on April 26, 2013, after Captain Nicole Aikens reported that Henderson threatened the lives of Simpkins and Ellis.  (IIU Case Report, ECF No. 30-4, at 2.[3])  Aikens also reported that Henderson claimed he had been choked by Simpkins.  (*Id*. at 7.)

Ellis was interviewed by IIU Detective Johnnathan Wright at MTC on July 22, 2013. (*Id*.)  She reported that on the morning of April 26, 2013, she was called to respond to the scene by officers who were conducting a search of Henderson's property after he became angry.  (*Id*.) When she arrived, she noticed that Henderson appeared to be "high" and asked if he had been smoking and he responded "yes...T-bags".  (*Id*.)  He then stated: "I can't get my stuff, so I had

---

[3] Simpkins notes that the memorandum has been redacted to omit the name of another inmate.

been smoking T-bags all night." (*Id.*) Henderson assured Ellis he was fine. She told him to put his shoes on so they could take a walk, but Henderson continued to interfere in the search and started to get other inmates involved. (*Id.*) Ellis reported that the officers found contraband, but she did not recall what it was. (*Id.*) Ellis stated that she continued to attempt to get Henderson to comply with her orders for approximately fifteen minutes at which point Henderson stated "I not going no fucking there," so she called for another sergeant and Simpkins responded to the scene. (*Id.*) At one point, Henderson stated "I'm going to kill you two." (*Id.*) Ellis believed that Henderson was finally handcuffed in the lobby. (*Id.*) During the escort Henderson attempted to stop and talk to Security Chief Rory Jones. (*Id.*) Ellis told Jones that Henderson was smoking tea bags, and Jones told her and Simpkins to take him to the medical unit. (*Id.*)

Ellis reported that the only time Henderson and Simpkins ever left her sight during the escort from the dorm to the holding cell was on the landing when she was talking to Security Chief Jones and Simpkins took Henderson to the holding cell. (*Id*. at 8.) Ellis stated that she did not witness any officer assault Henderson and that he threatened her and Simpkins several times. (*Id.*) Ellis advised that when Simpkins first arrived in the dorm and told Henderson to stand, he was trying to hold onto Henderson's arm, but Henderson pulled away. (*Id.*)

Henderson was also interviewed, on July 31, 2013, and stated that he did not know the reason Ellis and Simpkins arrived on the scene during the search of his property. (*Id.*) He stated that officers conducting the search were throwing his property around and that they broke his flat screen television. (*Id.*) He verified that "T-bags" are, literally, tea bags. (*Id.*) He stated that he told Ellis he was not going anywhere without his socks and shoes. (*Id.*) After Simpkins arrived, he allowed Henderson to put his shoes and socks on, had him stand up, and put handcuffs on him. (*Id.*) Plaintiff stated that he did not know the reason that he was being handcuffed. (*Id.*)

He alleged that Simpkins was pulling him down the stairs while he and the whole dorm of inmates were singing the following song: "My shoe box got gold in it, coke, weed and blow in it." (*Id.*) He asserted that when Simpkins tried to slam him into a wall, he said, "Brother, I'm fifty-six years old," and Simpkins responded "I don't give a fuck how old you are." (*Id.*) Henderson stated that, while Ellis and Simpkins were walking him in the yard, Simpkins was lifting up on the handcuffs, so plaintiff stated "[t]ake the handcuffs and the badge off and let's deal with it like a man." (*Id.*) Henderson alleged that when they saw Security Chief Jones, Simpkins put a choke hold on him while looking Jones in the eyes. (*Id.*) Henderson claimed that when Simpkins released him, he blacked out. (*Id.*) He stated that, at that point, he called Simpkins a "bitch" and threatened to kill him. (*Id.*) Henderson claimed that he was placed in the holding cell and, while there, told his side of the story to Lt. Latonya Bell and Sgt. Stan Emmanuel. (*Id.*) He maintained that he was then taken to the hospital where photographs were taken of his neck and wrists, and medical staff told him that he had bruises on his neck. (*Id.*) He also asserted that his neck was red. (*Id.*) Henderson stated that he requested pictures and reports, but no documents could be located. (*Id.*)

Henderson told Detective Wright that Jones, Bell, and Captain Nicole Aikens witnessed Simpkins assault him. He claimed that there were no prior incidents between him and any MTC officers. (*Id.* at 9.) He repeated that officers had broken his television during the search, but admitted that he had no paperwork for it and indicated that his cell buddy left it for him. (*Id.*) He told Wright that he wanted to press charges.[4] (*Id.*)

---

[4] The IIU report indicates that on November 18, 2013, Wright was unable to locate a report pertaining to the incident of April 26, 2013. (IIU Report at 9.) It was later confirmed by Captain Cheryl-Lynne Addison that no Serious Incident Report (SIR) or Use of Force (UOF) Report was prepared regarding the incident. (*Id.* at 9, 12.)

The same day of the incident, Henderson was transferred from MTC to the Maryland Reception, Diagnostic & Classification Center (MRDCC).  An Intra System Transfer Summary was prepared by Sandra Nwugo, RN.  (*Id*. at 14-15.)  Henderson was examined at MRDCC the following day by JoAnne Hartung, RN, who wrote "no" next to "[s]igns of abuse/trauma" in his medical record.  (*Id*. at 17.)  There is no evidence Henderson reported being assaulted or "choked out" by an officer at MTC the previous day.  (*See id*. at 17-19.)  On April 29, 2013, Henderson reported that he had been experiencing chest congestion accompanied with a cough for four days.  (*Id*. at 20-21.)  A chest x-ray that had been ordered on April 26, 2013, was read on May 28, 2013, and showed that the left lung was clear, but that there was opacity present in the right lower lobe with associated volume loss suggestive of atelectasis.[5]  Someone noted in Henderson's record that the opacity may have been due to an old infection.  (*Id*. at 16.)

Ultimately finding there were no reports, witnesses, or video to support Henderson's allegations against Simpkins, Detective Wright eventually determined that criminal charges were not warranted.  (*Id*. at 10.)

## Standard of Review

As noted, defendant has moved to dismiss or, in the alternative, for summary judgment. "'The purpose of a Rule 12(b)(6) motion [to dismiss] is to test the sufficiency of a complaint.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010) (citation omitted).  A Rule 12(b)(6) motion constitutes an assertion by the defendant that, even if the facts that plaintiff alleges are true, the complaint fails, as a matter of law, "to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6). Therefore, in considering a motion to dismiss under Rule 12(b)(6), a court must "'accept[ ] as true the well-pled facts in the complaint and view[ ] them in the light

---

[5] Atelectasis is the collapse of part or all of a lung. *See* "Atelectasis" Definition, Mayo Clinic, available at www.mayoclinic.org/diseases-conditions/atelectasis/basics/definition/con-20034847 (last visited July 22, 2014).

most favorable to the plaintiff.'" *Brockington v. Boykins*, 637 F.3d 503, 505 (4th Cir. 2011) (citation omitted).

Ordinarily, a court cannot consider matters outside the pleadings or resolve factual disputes when ruling on a Rule 12(b)(6) motion. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). If the court does consider matters outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see also Finley Lines Joint Protective Bd. Unit 200 v. Norfolk S. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

"There are two requirements for a proper Rule 12(d) conversion." *Greater Baltimore Center for Pregnancy Concerns, Inc. v. Mayor and City Council of Baltimore*, 721 F.3d 264, 281 (4th Cir. 2013). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which can be satisfied when a party is "aware that material outside the pleadings is before the court." *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985); *see also Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998) (commenting that a court has no obligation "to notify parties of the obvious"). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Greater Baltimore*, 712 F.3d at 281.

Henderson had adequate notice that Simpkins' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials are in themselves

sufficient indicia. *See Laughlin*, 149 F.3d at 260-61.  Further, Henderson has not pointed to any additional evidence, that exists, that would be helpful to the disposition of this case.  He did seek photos of his alleged injury after the incident and reports, but the record demonstrates they do not exist.  (*See* IIU Case Report at 8; Supp. to Compl., ECF No. 4, at 2-3.)  He did have access, however, to the affidavits and the record of his adjustment hearing, along with the other evidence presented in this case.  Accordingly, defendant's motion shall be treated as a motion for summary judgment.

Rule 56(a) of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002). At the same time, the court also must abide by the "affirmative obligation of the trial judge to

prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d

at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation marks

omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).   Plaintiff's claims of

excessive use of force, a lack of due process regarding his adjustment hearing, and his claim of

exposure to asbestos shall be examined in light of this standard of review.

### Analysis

Simpkins moves to dismiss Henderson's claims, arguing that Henderson has failed to

exhaust administrative remedies.   The Prisoner Litigation Reform Act (the "PLRA") provides, in

pertinent part:

> No action shall be brought with respect to prison conditions under
> section 1983 of this title, or any other Federal law, by a prisoner
> confined in any jail, prison, or other correctional facility until such
> administrative remedies as are available are exhausted.

 42 U.S.C. § 1997e(a).

As a prisoner, Henderson is subject to the strict requirements of the exhaustion

provisions.   A claim which has not been exhausted may not be considered by this court.   *See*

*Jones v. Bock*, 549 U.S. 199, 220-21 (2007).   It is of no consequence that Henderson is aggrieved

by a single occurrence, as opposed to general conditions of confinement.   *See Porter v. Nussle*,

534 U.S. 516, 528 (2002) (holding the § 1997e exhaustion requirement applied equally to suits

alleging unconstitutional prison conditions and suits alleging unconstitutional conduct by prison

officials in excessive force claims).   Exhaustion is also required even though the relief sought is

not attainable through resort to the administrative remedy procedure.   *Booth v. Churner*, 532

U.S. 731, 741 (2001).

Administrative remedies must, however, be available to the prisoner and this court is

"obligated to ensure that any defects in exhaustion were not procured from the action or inaction

of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007). The

Fourth Circuit has addressed the meaning of "available" remedies:

> [A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it. Conversely, a prisoner does not exhaust all available remedies simply by failing to follow the required steps so that remedies that once were available to him no longer are.  Rather, to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies "in accordance with the applicable procedural rules," so that prison officials have been given an opportunity to address the claims administratively.  Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond.

*Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (internal citations omitted).

Thus, Henderson's claims must be dismissed, "unless he can show that he has satisfied

the administrative exhaustion requirement under the PLRA or that [Simpkins has] forfeited [his]

right to raise non-exhaustion as a defense."  *Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md.

2003).

It does not appear that Henderson exhausted any administrative claim concerning the

alleged assault by Simpkins.  This showing may not be dispositive, however, as it appears that a

formal investigation was made into the incident.  The court is aware that within Maryland's

Department of Public Safety and Correctional Services, once the Internal Investigation Unit

initiates an investigation, the matter no longer is subject to the ARP process. *See* Mot. to Dismiss

Ex. 4 at 23, *Bogues v. McAlpine*, Civil Action No. CCB-11-463 (D. Md. July 14, 2011), ECF No.

23-5; Mem. at 7-8, *Oliver v. Harbough*, Civil Action No. ELH-11-996 (D. Md. Dec. 19, 2011),

ECF No. 31.  While there is a process to appeal an adjustment conviction, that process is separate

and apart from the ARP process raised by Simpkins as an affirmative defense to suit.  In any

event, it appears that Henderson did grieve the outcome of his adjustment hearing through the

Inmate Grievance Office, and his grievance was denied by an Administrative Law Judge who issued a decision and order on November 14, 2013.  (Def.'s Mot. Ex. 4, ECF 30-5, ¶ 3(a).)

Conditions of confinement claims are subject to an ARP exhaustion requirement as well. In Maryland, filing a request for administrative remedy with the Warden of the prison in which one is incarcerated within thirty calendar days of the incident (or of the date the prisoner first gained knowledge of the incident or injury) is the first of three steps in the ARP process provided by the Division of Correction to its prisoners.  If this request is denied, the prisoner has thirty calendar days to file an appeal with the Commissioner of Correction.  If this appeal is denied, the prisoner has thirty days in which to file an appeal to the Executive Director of the IGO.  *See* Division of Correction Directive 185-002.VI.L-N; *see also* Md. Code Ann. Corr. Serv. §§ 10-201-10-209.

Henderson attaches an ARP form dated April 17, 2013, and an ARP form with case number MRDCC #0609-13 dated April 27, 2013, regarding alleged exposure to asbestos, which Henderson asserts that he was forced to withdraw on May 24, 2013.  (Supp. to Compl. Exs. 3, 4, ECF Nos. 4-3, 4-4; Supp. to Compl. Exs. 1, 2, ECF Nos. 38-1, 38-2.)  The record contains no facts, however, supporting his claim that he was forced to withdraw his complaint.  The claim of asbestos exposure during a one-month period is thus subject to dismissal for failure to exhaust.[6]

Henderson's claim that he was denied due process at his adjustment hearing fails.  In prison disciplinary proceedings which bring the possible loss of good conduct credits, a prisoner is entitled to certain due process protections.  *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974). These include advance written notice of the charges against him, a hearing, the right to call witnesses and present evidence when doing so is not inconsistent with institutional safety and

---

[6] In the withdrawn ARP, Henderson states his "lungs are full of infectious" and he has "headaches and breathing problems."  (Supp. to Compl. Ex. 4, ECF 4-4, at 1.)  These allegations are not borne out by the medical record following his transfer to MRDCC, nor by the April 26, 2013 x-ray which revealed findings consistent with an old infection.

correctional concerns, and a written decision.   *Id.* at 564-572.   Substantive due process is satisfied if the disciplinary hearing decision was based upon "some evidence."   *Superintendent, Mass. Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985).

Henderson received all the process he was due.   He was given timely advance written notice of the infractions and was permitted to attend the disciplinary hearing, testify, and call witnesses, none of whom supported his version of the incident.   He claims he was denied an opportunity to submit medical documentation and pictures to show injuries consistent with having been "choked out" by Simpkins; however, the record does not suggest that any injuries were found by medical staff, or that any pictures were taken.   No good conduct credits were revoked as a result of the disciplinary infractions. Moreover, the hearing officer's determination of guilt was based upon some evidence, including testimony, for which the hearing officer based was able to judge credibility and demeanor.[7]

In examining Henderson's final allegation of excessive use of force, this court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986).   The absence of significant injury alone is not dispositive of a claim of excessive force. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010).    In the instant case the initial application of force—handcuffing and removing Henderson from his cell during a search after he became verbally angry—passes constitutional muster.   Further, there is no evidence that the use of force was allowed to linger long after the need for it expired.   *See Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992) (holding the force is excessive if inflicted "maliciously and sadistically to cause harm").   Simpkins has provided a declaration in which he

---

[7] The court notes that the hearing officer found Henderson "not guilty" of one rule violation because the officer determined there was no evidence to support the charge.

attests that he helped escort Henderson from his cell.  The declaration does not suggest that any additional amount of force—other than walking Henderson to the segregation booth while he was handcuffed—was applied.  Simpkins' version of events is supported by other officers' reports noted in the IIU investigation report.[8]

Henderson, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder reasonably could find in his favor. He has failed to submit any evidence to support his claim of excessive force beyond his own allegations.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment.").  The evidence demonstrates Simpkins was responding to another officer's request for assistance because Henderson was resisting a lawful cell search; the force Simpkins used to gain Henderson's compliance in leaving his cell was tempered; and Henderson had no objective injuries.  There is simply no evidence that Simpkins was acting maliciously or sadistically to cause harm to Henderson.

Accordingly, summary judgment will be granted in Simpkins' favor and Henderson's motion for leave to supplement his complaint will be denied.  A separate order follows.


July 24, 2014                                                          /s/
Date                                                    Catherine C. Blake
                                                       United States District Judge

---

[8] Henderson's claim to the contrary, no medical evidence suggests that he was injured in any way on April 26, 2013.